Filed 11/3/22  P. v. Steward CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H046931 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1641635) |
| v. | |
| AARON LAMONT STEWARD, | |
| Defendant and Appellant. | |

A jury convicted defendant Aaron Lamont Steward of, among other things, burglary and multiple counts of robbery related to crimes that occurred in 2015 and 2016. Defendant contends on appeal that a pattern jury instruction regarding flight and consciousness of guilt violated due process as applied to him; that unrelated counts should have been severed for trial; that admitted photographs of one victim's injuries were unduly prejudicial; that there was insufficient evidence that he personally used a firearm during one robbery; and that his trial counsel was ineffective for making a factual misstatement during closing argument.  For the reasons stated here, we find no prejudicial error requiring reversal.  We will modify the judgment to strike a prior prison term enhancement that no longer applies due to a change in the law, and will affirm the judgment as modified.

## I.  TRIAL COURT PROCEEDINGS

The operative second amended information charged defendant with:  second degree robbery (Pen. Code, § 211; count 1; unspecified statutory references are to the

Penal Code); reckless driving while attempting to evade the police (Veh. Code, §§ 2800.1, 2800.2, subd. (a); count 2); conspiracy to commit burglary and robbery (§§ 182, subd. (a)(1), 459, 460, 211, 212.5, subd. (a); count 3); first degree burglary (§§ 459, 460, subd. (a); count 5); two counts of first degree robbery (§§ 211, 212.5, subd. (a); counts 8 & 9); possessing a firearm as a felon (§ 29800, subd. (a)(1); count 10); unlawfully possessing ammunition (§ 30305, subd. (a)(1); count 11); and vehicle theft with a prior conviction (§ 666.5, subd. (a); count 12). The information alleged that defendant personally used a firearm while committing counts 1, 8, and 9 (§ 12022.53, subd. (b)). The information also alleged defendant had one prior strike conviction (§ 667, subds. (b)-(i)), one prior serious felony conviction (§ 667, subd. (a)), had served one prior prison term (§ 667.5, subd. (b)), and was on bail when he committed counts 3, 5, and 8 through 12. The reckless driving charge in count 2 was dismissed by prosecution motion during trial.

Codefendant Holden Falk entered into a plea agreement before trial, a condition of which was testifying truthfully at defendant's trial as a prosecution witness.

### A. MUKHEED ROBBERY (AUGUST 2015)

Abdul Mukheed testified through an interpreter that he visited Mountain View from his home in India on business in August 2015. Mukheed took the bus back to his hotel from his office after work one night. He got off the bus and walked toward the hotel carrying a black backpack containing a laptop and his passport. A light-colored sedan pulled up next to him. A man approached Mukheed, showed him a gun, and told him to "give everything to him." The gun was small and black. The man with the gun was four or five feet from Mukheed, who described being scared because this was the first time he had seen a gun, much less had one pointed at him. Mukheed could not provide many details about the man's appearance other than that he had long black hair. He testified that "most of the time I was looking at [the] gun, and this happened so fast that I didn't get to see everything else." The perpetrator took Mukheed's backpack,

2

wallet, and cell phone before getting into the passenger side of the car which then sped away.

A California Highway Patrol (CHP) officer testified that he was driving in Mountain View while off duty in August 2015. A green car parked in a no-stopping area on the side of the road caught his attention. As the officer drove by, he noticed two men standing next to the car; one appeared to be Indian and the other appeared to be a lighter-skinned Black man. The Black man was about five feet nine inches tall, and weighed about 180 pounds. The Black man was wearing a black hat and had braided hair. The Black man was also holding what appeared to the officer to be a black, semiautomatic pistol. The officer acknowledged that due to the distance between his car and the men (around 60 to 70 feet), he could not be certain that the gun was real and agreed that it could have been a good replica. The officer reported the suspected robbery to the Mountain View Police Department.

A Mountain View Police Department officer testified about responding to the robbery dispatch and interviewing Mukheed, apparently in English because there was no mention of an interpreter. Mukheed told the officer that a light-skinned Black man got out of a green sedan and robbed him at gunpoint. (Mukheed's statements to the officer were admitted over hearsay objections as prior inconsistent statements.) The officer initially testified that Mukheed described the handgun as a black revolver. On cross-examination, the officer could not recall whether Mukheed had actually described the gun as a revolver. The officer also acknowledged that during a recorded interview Mukheed told him that the gun "just look[ed] like a toy gun." (The recording was admitted into evidence and played for the jury.) The officer did not follow up with Mukheed about the toy gun statement.

A Palo Alto Police Department patrol officer heard the robbery dispatch and saw a green car matching the dispatch description on the street in front of him. He was within a few miles of the site of the robbery. He saw in the car two Black men, one with long

3

dreadlocks. The officer followed the car and activated his lights and siren to make a traffic stop. The suspect car led the officer on a high-speed chase and eventually crashed into another car. The occupants got out and fled. The passenger was holding a black backpack, and had shoulder-length dreadlocks. No one had changed positions in the car during the chase. The officer chased the men on foot, and the passenger dropped the backpack. The suspects split up, and the officer followed the passenger. The officer caught up to him, drew his gun, and the suspect got down onto the ground appearing to comply with the officer's commands. The suspect then jumped to his feet and continued running. The officer caught up a short time later as the passenger was struggling with officers trying to detain him in the kitchen of a nearby house. The officer identified defendant at trial as the passenger, and confirmed that Mukheed's backpack was the item the passenger had dropped while running. Defendant did not have a gun when he was arrested, and none was ever found.

Mukheed was taken to where defendant was detained and was asked if he recognized him. Mukheed could not conclusively identify defendant, but noted that defendant's long hair was similar in color and style to that of his assailant. The police returned Mukheed's bag, passport, and laptop to him.

The reporting CHP officer had also been asked to identify the car and one suspect later the same evening. He confirmed that the green car was the same one he reported to the police. The officer was shown a man in a patrol car and the officer initially "thought it was the driver" because the suspect had his hair down and the passenger had had his hair in a ponytail when the officer saw him standing with a gun on the side of the road. He confirmed at trial that defendant was the person he saw at the show up, and stated that he could not definitively state whether defendant was the driver or the passenger during the robbery because the officer had been too far away while driving past.

4

## B. GOEL BURGLARY AND ROBBERY (JANUARY 2016)

Ajit Goel testified that he was at home with his wife in Saratoga when the doorbell rang late one night in 2016. Goel opened the door partially to ask the man what he needed, and the man reached his arm through the gap holding a gun. Goel tried to slam the door on the man's arm, but the man was stronger and pushed his way inside. At the time of trial in October 2018 Goel was 71 years old and weighed 155 pounds. The man hit Goel on the head with the gun barrel. Goel tried to fight back, but fell to the floor when the man hit him in the face with the gun. Goel began bleeding profusely, which prevented him from seeing out of his left eye. Goel's wife came from the other room and yelled at the man to leave. When the man did not leave, Goel's wife hit an emergency button that triggered a loud alarm. The man left, and Goel's wife locked the door behind him. Goel testified that his surgeon later told him that had the ambulance arrived a few minutes later, he would have died from his injuries. Photographs of Goel's injuries were admitted over a defense objection under Evidence Code section 352.

Codefendant Falk testified that he went with defendant and another man (referred to as Nacho) to the Goels' house to rob them. Nacho had cleaned the Goels' house before and believed there would be valuable items there to steal. Defendant encouraged Falk to use a gun to scare the Goels. The plan was for Falk to go inside, tie up the Goels, and then steal items from the home (possibly with defendant's help). Falk forced his way inside when Goel answered the door, and he hit him twice with the gun because he was screaming. Falk fled without taking anything when Goel's wife triggered a loud alarm. An expert in "call detail record analysis" testified that information from cellular towers and cell phones associated with Falk and defendant suggested that Falk and defendant were near the Goel residence on the date and time of the robbery.

## C. CALLAWAY BURGLARY AND ROBBERY (JULY 2016)

Jerry Callaway lived with his wife in Los Gatos. He was 71 at the time of trial. Callaway arrived home from work after 10:00 p.m. one night in July 2016. As he was

5

unloading his car in the garage, a man holding a gun and wearing a skeleton mask ran into the garage. Callaway, who was familiar with guns, testified that the gun appeared to be a 0.38-caliber revolver, with a checkered wooden grip and worn blue coloring on the barrel. Callaway ran inside the house. The man wedged his foot in the door before Callaway could close it. He yelled to his wife to call 911. The man with the gun came into the house along with another masked man who was carrying a knife. The second man might have been wearing a bandana. The man with the gun ran down the hall while the man with the knife watched Callaway. The man with the gun brought Callaway's wife to the kitchen. The men took jewelry worth over $6,000 and about $2,700 in cash. One man ransacked the house while the other stood guard over Callaway and his wife. The men left after about 30 minutes.

Falk testified that he and defendant robbed the Callaways, with another person acting as the driver. They used a Camaro that defendant told Falk he had stolen. Defendant was wearing a skull mask and dark clothing. Falk was wearing a blue bandana around his face. Defendant approached the house first and forced his way inside; Falk followed him in. Defendant pointed a gun at Callaway and told him he was being robbed. Defendant went down the hall to find Callaway's wife while Falk kept Callaway in the kitchen at knifepoint. Defendant brought Callaway's wife to the kitchen, and then defendant and Falk took turns ransacking the house looking for items to steal. Among other things, they took jewelry, Apple digital devices, and cash.

A district attorney's office criminalist testified at trial about comparing DNA samples from defendant and Falk to samples from pieces of evidence. Defendant's DNA matched a sample from the skeleton mask. Falk's DNA matched a sample from the bandana that was recovered from the Camaro. A mixture of DNA on the trigger of the handgun had a high statistical likelihood of coming from Falk, defendant, and another person.

6

## D. ARREST AND INVESTIGATION

A San Jose Police Department officer was on patrol in the east side of the city two days after the Callaway robbery. The officer saw a man (identified at trial as defendant) sitting in a Camaro near a motel. The officer ran the license plate through a database and learned that it might have been reported stolen. The officer turned his car around and parked within 10 feet of the Camaro.

Defendant got out of the car and started walking away from the officer. The officer told defendant to stop and show his hands, and he initially complied. The officer directed defendant to face the patrol car and put his hands on the hood, and defendant initially did so but then repeatedly dropped his hands and tried to turn around to face the officer. The officer reached out to handcuff defendant until backup arrived, and defendant tried to elbow the officer and started running away. The officer tased defendant causing him to fall over. Defendant threw an item he had been holding, which the officer later recovered and confirmed was the key fob for the Camaro. The officer handcuffed and arrested him. Defendant was approximately five feet nine inches tall and 160 pounds when he was arrested in July 2016.

A different officer found a black revolver under the Camaro near the rear bumper on the driver's side. Callaway testified that a photograph of that gun admitted into evidence at trial looked like the same gun used in the robbery at his home. Police found a dark bandana in the trunk of the Camaro. A search of defendant incident to arrest disclosed a silver ring, a diamond earring, and a key to a room in the nearby motel. Callaway's wife testified that the ring and earring had been stolen from her house.

The police went to the room associated with the key found in defendant's pocket. Falk answered the door when the police knocked, and appeared to be under the influence of methamphetamine. An officer put Falk in handcuffs while other officers searched the motel room. The officers found items that they later determined had been stolen from the Callaway house as well as a fabric mask with a skeleton print.

7

### E. VERDICT AND SENTENCING

The jury deliberated for less than two full days before reaching a verdict. The jury found defendant guilty as charged; found true the firearm allegations as to counts 1, 8, and 9; and found true the on-bail allegations as to counts 3, 5, and 8 through 12. As we will discuss in more detail, the record indicates the trial court imposed a sentence of 49 years.

## II.    DISCUSSION

### A. CALCRIM NO. 372 INSTRUCTION REGARDING FLIGHT

Defendant contends his Sixth and Fourteenth Amendment rights to due process and a fair trial were violated when the trial court instructed the jury that flight could indicate consciousness of guilt.

CALCRIM No. 372 is a pattern jury instruction which implements section 1127c. Section 1127c provides: "In any criminal trial or proceeding where evidence of flight of a defendant is relied upon as tending to show guilt, the court shall instruct the jury substantially as follows: [¶] The flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, the jury may consider in deciding his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine. [¶] No further instruction on the subject of flight need be given." Though defendant focuses on CALCRIM No. 372, we note that because such an instruction is required by section 1127c, the issue amounts to an as applied challenge to that statute.

An as applied challenge "contemplates analysis of the facts of a particular case or cases to determine the circumstances in which the statute or ordinance has been applied and to consider whether in those particular circumstances the application deprived the individual to whom it was applied of a protected right." (*Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084.) "When a criminal defendant claims that a facially valid

8

statute or ordinance has been applied in a constitutionally impermissible manner to the defendant, the court evaluates the propriety of the application on a case-by-case basis to determine whether to relieve the defendant of the sanction." (*Ibid.*) Defendant contends application of section 1127c deprived him of his federal constitutional due process right to a fair trial. "In order to declare a denial of [due process] we must find that the absence of that fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial." (*Lisenba v. California* (1941) 314 U.S. 219, 236.)

Defendant objected on due process grounds to the prosecution's proposal to instruct the jury on flight as consciousness of guilt (CALCRIM No. 372). Counsel argued that as an African American[1] man, it was a "necessity in today's world for somebody like my client to not put himself in a situation if he can help it where he's encountering officers who could harm or kill him." The trial court overruled the objection, finding substantial evidence to support the instruction and noting that the instruction "caution[s] that [the] evidence of flight cannot prove guilt by itself." Using CALCRIM No. 372, the jury was instructed as follows: "If the defendant fled immediately after a crime was committed, that conduct may show that he was aware of his guilt. If you conclude the defendant fled, it's up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled cannot prove guilt by itself."

Defense counsel discussed the flight instruction in closing argument: "So why did he run? He ran because he was—that consciousness of guilt. He knows he robbed Mr. Mukheed. Yeah, that's one reasonable interpretation. Or he ran because he knew something happened because the cops were chasing him, and somehow he's got this hot bag, and he knows something's up. [¶] Or maybe he ran for other reasons other than guilt.

---

[1] We use the term African American in this section because it was the nomenclature of the arguments in the trial court and the appellate briefing.

9

I don't know what it's like to be a young African-American male being chased by armed police officers, but in today's society there may be reason for him to run other than consciousness of guilt."

Defendant argues on appeal that the "flight of a person of color cannot support a reasonable inference of guilt." We understand defendant's argument as urging that when a defendant is a person of color, it is unreasonable as a matter of law for a jury to infer that his or her flight from the police shows consciousness of guilt.

Section 1127c and CALCRIM No. 372 describe a permissive inference, "which allows—but does not require—the trier of fact to infer the elemental fact from proof by the prosecutor of the basic one and which places no burden of any kind on the defendant." (*County Court of Ulster County v. Allen* (1979) 442 U.S. 140, 157 (*Allen*).) The first sentence of the pattern instruction describes the inference: "If the defendant fled immediately after a crime was committed, that conduct may show that he was aware of his guilt."

"A permissive inference violates the Due Process Clause only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury." (*Francis v. Franklin* (1985) 471 U.S. 307, 314–315; see *Allen*, *supra*, 442 U.S. at p. 157 [Because a "permissive presumption leaves the trier of fact free to credit or reject the inference and does not shift the burden of proof, it affects the application of the 'beyond a reasonable doubt' standard only if, under the facts of the case, there is no rational way the trier could make the connection permitted by the inference"].) Courts have consistently upheld CALCRIM No. 372 against other constitutional challenges. (See, e.g., *People v. Hernandez Rios* (2007) 151 Cal.App.4th 1154, 1159 [instruction does not lower prosecution's burden of proof]; *People v. Paysinger* (2009) 174 Cal.App.4th 26, 30-32 [instruction does not unconstitutionally presume a crime was committed].)

10

We note as a threshold matter that substantial evidence supported instructing the jury with CALCRIM No. 372. The car associated with Mukheed's robbery fled the scene. When pursued, the car continued its flight until it crashed. Defendant got out of the car carrying Mukheed's backpack and began running. When an officer caught up on foot, defendant initially complied with the officer but then continued fleeing. Defendant was ultimately apprehended by other officers in the kitchen of a nearby house. The foregoing is substantial evidence that defendant fled the scene of Mukheed's robbery, and the jury was properly instructed it could consider that evidence in deciding whether defendant fled because he knew he had in fact committed the robbery. That the jury here could rationally make that connection based on the evidence distinguishes this case from those relied on by defendant where courts found the instruction was not supported by the evidence. (Citing *United States v. Myers* (5th Cir. 1977) 550 F.2d 1036, 1050.)

Defendant argues the instruction violates due process because it has a disparate and discriminatory impact on African Americans, who might have objectively reasonable and lawful reasons for avoiding the police. Without requesting judicial notice, defendant cites studies related to institutional racism, including a Judicial Council of California report about African American and Latin American individuals making up greater percentages of the criminal defendant population relative to their percentage of the total California population. But the existence of other reasons for flight does not compel the conclusion that a consciousness of guilt inference would be unreasonable as a matter of law. Those arguments are properly directed to the jury which must decide what if any weight to give evidence of defendant's flight. Indeed, defense counsel did so: "I don't know what it's like to be a young African-American male being chased by armed police officers, but in today's society there may be reason for him to run other than consciousness of guilt."

Pointing to cases discussing whether and to what extent flight can be considered in determining whether a peace officer has reasonable suspicion to detain a suspect (e.g.,

11

*United States v. Brown* (9th Cir. 2019) 925 F.3d 1150, 1156-1157), defendant poses a rhetorical question: "If the flight of a Black man from police does not create reasonable suspicion to detain, how can we allow jurors to use that flight to find the defendant was conscious of guilt?" But none of defendant's authorities found flight categorically irrelevant as defendant would have us do here; rather, they acknowledge that racial disparities in policing are relevant to determining whether flight supports a reasonable suspicion to detain. (See *Brown*, at p. 1157 ["Given that racial dynamics in our society— along with a simple desire not to interact with police—offer an 'innocent' explanation of flight, when every other fact posited by the government weighs so weakly in support of reasonable suspicion, we are particularly hesitant to allow flight to carry the day in authorizing a stop."].) The *Brown* court emphasized that data about racial disparities in policing "cannot replace the 'commonsense judgments and inferences about human behavior' underlying reasonable suspicion analysis," but "can inform the inferences to be drawn from an individual who decides to step away, run, or flee from police without a clear reason to do otherwise." (*Ibid.*)

Because we have found no error arising from the jury instruction on flight in this record, defendant's corresponding due process challenge to the firearm enhancement associated with the Mukheed robbery necessarily fails.

## B. JOINDER OF OFFENSES

Defendant argues the trial court abused its discretion by denying his motion to sever the consolidated case into two or more cases. A trial court may consolidate two or more accusatory pleadings if, among other things, the different offenses are "connected together in their commission" or are "two or more different offenses of the same class of crimes or offenses." (§ 954.) "In cases in which two or more different offenses of the same class of crimes or offenses have been charged together in the same accusatory pleading, or where two or more accusatory pleadings charging offenses of the same class of crimes or offenses have been consolidated, evidence concerning one offense or

12

offenses need not be admissible as to the other offense or offenses before the jointly charged offenses may be tried together before the same trier of fact." (§ 954.1.) "Because consolidating or joining actions is efficient, there is a preference to do so." (*People v. Vargas* (2020) 9 Cal.5th 793, 817.) A defendant "must make a ' "*clear* showing of prejudice to establish that the trial court abused its discretion" ' " in refusing to sever charges that meet the consolidation criteria. (*People v. Soper* (2009) 45 Cal.4th 759, 774 (*Soper*), italics omitted.) We consider the following factors when reviewing a decision to consolidate cases: the cross-admissibility of evidence in hypothetical separate trials; whether some of the charges are particularly likely to inflame the jury against the defendant; whether a weak case has been joined with a strong case or another weak case so that the totality of the evidence may alter the outcome as to some or all of the charges; (and, not applicable here, whether one of the charges but not another is a capital offense, or the joinder of the charges converts the matter into a capital case). (*Id.* at p. 775.)

Defendant was initially charged in three separate cases for the crimes that were eventually tried jointly. The trial court granted motions to consolidate the cases into a single prosecution, over defense objections. Defendant moved in limine to sever the three consolidated cases. In denying the motion, the court acknowledged the Mukheed robbery was not connected to codefendant Falk, but the court reasoned it was connected to "the People's allegation that this is really kind of a crime spree period where the defendant is committing a series of felony theft-related crimes. They are all property crimes and the same class of crimes, and I do not think there would be any prejudice in including Count 1 [Mukheed]. It's not a particularly stronger case or weaker case than the other counts." The court also acknowledged that the Mukheed robbery evidence would likely not be cross-admissible in separate trials on the other robberies, but reasoned that none of the various charges would particularly inflame the jury.

The trial court properly joined the various robberies into a single case. All three incidents involved not only the same class of offense but the same *actual* offense,

13

robbery (§ 211).  Because the charges were properly joined under section 954, defendant "must make a ' "clear showing of prejudice to establish that the trial court abused its discretion" ' " in refusing to sever the charges.  (*Soper*, *supra*, 45 Cal.4th at p. 774, italics omitted.)  We see no abuse of discretion on this record.  That evidence from the Goel and Callaway robberies may not have been cross-admissible in a separate prosecution for the Mukheed robbery does not compel a finding that the cases should have been severed.  (§ 954.1 ["evidence concerning one offense or offenses need not be admissible as to the other offense or offenses before the jointly charged offenses may be tried together before the same trier of fact"].)

All three incidents involved the same charged crime of robbery, regardless of degree, as all robberies are by statute both serious and violent crimes.  (§§ 1192.7, subd. (c)(19), 667.5, subd. (c)(9).)  We recognize that Mukheed was not injured as was Goel, but Mukheed was robbed at gunpoint on the street.  The trial court could reasonably find none of the robberies substantially more inflammatory than any other.

Nor was the evidence supporting the Mukheed robbery substantially weaker than evidence of the others.  Defendant was seen shortly after the robbery getting out of a car matching the description of the suspect car and tossing Mukheed's backpack onto the ground before running from police.  The officer who initiated the traffic stop testified that the occupants of the suspect car did not change positions during the chase, supporting an inference that defendant was the person who had robbed Mukheed.

Here again, because the trial court did not abuse its discretion in denying defendant's motion to sever the robberies for separate trials, defendant's related challenge to the firearm enhancement for the Mukheed robbery necessarily fails.

### C.  PHOTOS SHOWING VICTIM INJURIES

Defendant contends the trial court erred in overruling his Evidence Code section 352 objection to the admission of "gory photographs of Goel's facial features, sustained when Falk pistol-whipped him."  "A trial court may admit photographs of

14

victims even when the photographs are 'gruesome' if 'the charged offenses were gruesome' and the photographs '[do] no more than accurately portray the shocking nature of the crimes.' " (*People v. Morales* (2020) 10 Cal.5th 76, 104 (*Morales*).) "The jury can, and must, be shielded from depictions that sensationalize an alleged crime, or are unnecessarily gruesome, but the jury cannot be shielded from an accurate depiction of the charged crimes that does not unnecessarily play upon the emotions of the jurors." (*People v. Ramirez* (2006) 39 Cal.4th 398, 454.) We review the admission of photographs showing a victim's injuries for abuse of discretion. (*People v. Crittenden* (1994) 9 Cal.4th 83, 133.)

Defendant did not identify in his opening brief the specific photographs to which his argument relates, nor did he request that the relevant exhibits be transmitted to this court. In his reply brief, defendant describes the four challenged photographs from exhibit Nos. 12 and 13 as: "Goel at the scene with a bandaged head"; "Goel on the operating table with his head wound visible"; "Goel's head after the surgery"; and "Goel's head after the surgeries." Because the Attorney General was able to identify and respond to defendant's argument despite defendant's failure to properly present the issue for review, we will address its merits.

Defendant argues the photographs were irrelevant because the "jury was not enlightened one whit by seeing them." But we find the challenged photographs relevant and admissible for multiple reasons. They supported the force or fear element of robbery. They corroborated Falk's and Goel's testimony about the robbery. (*People v. Scheid* (1997) 16 Cal.4th 1, 15 [photographs relevant to corroborate witness statements].) And they accurately portrayed the nature of the crime committed by Falk at defendant's urging, even though defendant did not personally enter the house. (Falk testified that defendant encouraged him to use a gun to scare the Goels, although there was no testimony that defendant specifically encouraged Falk to strike Goel with the gun.) (*Morales*, *supra*, 10 Cal.5th at p. 104.)

15

Asserting that the photographs' probative value was substantially outweighed by the risk of undue prejudice, defendant compares his case to *People v. Marsh* (1985) 175 Cal.App.3d 987. But that case is readily distinguishable because the challenged photographs there involved "seven gory autopsy photographs" (*id.* at p. 998), including "an almost full view of the victim's nude body the closeup portion of which is the exterior surface of the exposed brain below which dangles part of the bloody scalp and in the background of which is the child's blood-splattered torso 'field dressed' with the ribcages rolled back to expose the bowels." (*Id.* at p. 996.) The challenged photographs here are nothing like those at issue in *Marsh*. The trial court described the photos here as "not extremely gory. There is some blood but it's—my understanding is he did end up having brain surgery. It's not like there's a photograph of the brain surgery or opening up his head or anything like that." Having reviewed the photographs ourselves, we find nothing inaccurate in the trial court's description. Given that the photos were relevant and not unnecessarily gruesome, the trial court did not abuse its discretion in determining that their probative value was not substantially outweighed by the risk of undue prejudice.

Because we find no error in admitting the challenged evidence, defendant's related federal constitutional due process argument necessarily fails.

### D. SUFFICIENCY OF THE EVIDENCE OF PERSONAL FIREARM USE

Defendant argues the firearm enhancement associated with the Mukheed robbery must be stricken because the evidence was insufficient to show that he used an actual firearm, as opposed to a realistic toy gun. "In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) In support of the judgment we presume the "existence of every fact that the trier of fact could reasonably deduce from the evidence."

16

(*People v. Medina* (2009) 46 Cal.4th 913, 919.)  To overturn a conviction based on insufficient evidence, "it must clearly appear that upon no hypothesis whatever is there sufficient substantial evidence to support it."  (*People v. Redmond* (1969) 71 Cal.2d 745, 755.)  In reviewing the sufficiency of the evidence, we resolve neither credibility issues nor evidentiary conflicts.  (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

Defendant contends that Mukheed, "who was not familiar with guns, testified that he thought the small black gun appellant pointed at him was a toy."  We disagree with defendant's characterization of the trial testimony.  Mukheed consistently referred to the item in the perpetrator's hand as a gun, not a toy, and never mentioned anything about the gun possibly being a toy.

The trial testimony defendant cites came not from Mukheed but from a police officer who responded to the scene and took a statement from Mukheed.  During cross-examination, defense counsel asked the officer questions about a recorded interview he conducted in English with Mukheed the night of the robbery.  The officer was apparently explaining the difference between a semiautomatic handgun and a revolver and asked Mukheed if the gun was round.  The transcript of the interview indicates Mukheed's response was:  "It's not round, it's—it's, uh [pause] it just look like a toy gun."  The only other testimony about the firearm came from the eyewitness off-duty CHP officer who testified that he saw the suspect holding what appeared to be a black, semiautomatic pistol.  The officer acknowledged that due to the distance between his car and the men, he could not be certain that the gun was real and agreed that it could have been a good replica.

"Circumstantial evidence alone is sufficient to support a finding that an object used by a robber was a firearm."  (*People v. Monjaras* (2008) 164 Cal.App.4th 1432, 1436.)  "[W]hen faced with what appears to be a gun, displayed with an explicit or implicit threat to use it, few victims have the composure and opportunity to closely examine the object; and in any event, victims often lack expertise to tell whether it is a

17

real firearm or an imitation. And since the use of what appears to be a gun is such an effective way to persuade a person to part with personal property without the robber being caught in the act or soon thereafter, the object itself is usually not recovered by investigating officers." (*Ibid.*)

Sufficient circumstantial evidence supports the firearm enhancement here. Defendant argues "no witnesses testified that they thought the gun was real." But Mukheed consistently referred to it as a gun and not a toy at trial when testifying through an interpreter. The CHP officer believed it was a gun, even though he candidly acknowledged he could not state with certainty that it was real. Implicit in the witnesses' use of the word "gun" and not "toy" is a belief that the gun was real. The jury was entitled to credit that testimony over the ambiguous statement Mukheed made to an officer in English without an interpreter.

### E. CLOSING ARGUMENT AND EFFECTIVENESS OF TRIAL COUNSEL

Defendant contends his trial counsel provided ineffective assistance by inaccurately describing the trial evidence about the Mukheed robbery during closing argument. To establish ineffectiveness of trial counsel in violation of the right to counsel under the Sixth Amendment to the United States Constitution, a defendant must show both a deficiency in counsel's performance and a prejudicial effect of the deficiency. (*People v. Ledesma* (1987) 43 Cal.3d 171, 216-217.) To prove prejudice from deficient performance, a defendant must affirmatively show a reasonable probability that, but for trial counsel's error, the result would have been different. (*Id.* at pp. 217-218.)

The statement defendant identifies relates to trial counsel's description of testimony from the eyewitness off-duty CHP officer. That witness testified that as he drove past what appeared to be a robbery in progress, he saw a man with "a weapon in his hand." The officer described it as a "[s]emiautomatic pistol, black, rectangular shape." The officer acknowledged that due to the distance between his car and the man

18

(around 60 to 70 feet), he could not be certain that the gun was real and agreed that it could have been a good replica.

During closing argument about the Mukheed robbery, defense counsel noted conflicting testimony as to whether defendant was the driver or the passenger. Counsel stated: "I'm not telling you [defendant is] not involved in this. He is, but he's charged with personally using a real gun to rob Mr. Mukheed." Counsel argued there was reasonable doubt as to whether defendant was the driver or the passenger. Counsel mentioned Mukheed's statement to the interviewing officer that "it looked like a toy gun," and criticized the officer for not asking follow-up questions. He reminded the jury that the prosecution had to "prove for the enhancement that it was a real gun."

Counsel continued that "we want you to believe the snippet in the video that said the robber came out of the passenger seat. Don't believe CHP Officer Ruiz who comes in here and says that was the driver. I saw this guy Aaron Steward. That was the driver. This guy, Officer Ruiz, is not some dude off the street. This is a CHP officer, a trained observer, a law enforcement officer. He is so familiar with identification procedures that he tells us, 'Well, they didn't give me an admonition. I know how this stuff works, and they're supposed to give me an admonition. They're supposed to tell me this may not be the guy.' He knows the admonition so he doesn't need it, but he knows the process. [¶] Now, why is that important? It's important because Officer Ruiz had every opportunity to do what Mr. Mukheed did and what the Callaways did and tell you 'I don't know. I don't know.' . . . But [the CHP officer] comes in and he tells you—and he—at the time he says 'I ID'd him. That's the driver. *Also*, *I saw it was a semiautomatic pistol and it looked real*, *not the round revolver*' that we talked about earlier like [another officer] said." (Italics added to indicate the portion of the argument defendant challenges on appeal.)

The jury submitted two relevant questions during deliberations. First, the jury asked: "Is the man committing the robbery equally guilty of the robbery as the driver.

19

Ie.. is there a difference between driver and passenger if a robbery/burglary." (Errors in original.) The court responded by referring the jury to CALCRIM Nos. 400 and 401, which describe aider and abettor liability. Second, the jury asked: "For a weapon/firearm rider must the gun be proven to be a real gun? Or an item that looks like a real gun for the purpose acceptable for the charge." The court referred the jury to CALCRIM No. 3146, which defines "firearm" as "any device designed to be used as a weapon, from which a projectile is discharged or expelled through a barrel by the force of an explosion or other form of combustion." (Italics omitted.)

The essence of defense counsel's closing argument about the Mukheed robbery was that the prosecution had not proven its case beyond a reasonable doubt because the evidence conflicted on key points. The conflicting testimony concerned both whether the gun at issue was real and also whether defendant had been the passenger or the driver (important because if defendant was the driver instead of the passenger/robber, the personal firearm use enhancement would not apply to him). Defendant challenges defense counsel's reference to the CHP officer's testimony suggesting that the gun he saw " 'looked real.' " The witness testified that he saw the robber holding a "[s]emiautomatic pistol, black, rectangular shape" in his right hand, but he also acknowledged it may have been a "good replica." Implicit in the statement that the item would have to have been a "good replica" is that the item looked like a real gun to the trained officer. We find counsel's argument to be a fair description of the CHP officer's testimony, and defendant has therefore not demonstrated deficient performance.

Nor has defendant demonstrated prejudice. We have already summarized the sufficient evidence supporting the firearm enhancement. Trial counsel noted in his argument Mukheed's interview statement about the item possibly being a toy gun and argued the prosecution had not proven all elements of the firearm enhancement beyond a reasonable doubt. Considering also the jury instruction that counsel's argument was not evidence (see *People v. Lindberg* (2008) 45 Cal.4th 1, 26 [we presume the jury follows

20

instructions provided to it]), we see no reasonable probability that different or additional argument about the CHP officer's testimony would have led to a more favorable result.

## F. CUMULATIVE PREJUDICE

Defendant claims that the trial errors he identifies are cumulatively prejudicial. (Citing *People v. Hill* (1998) 17 Cal.4th 800, 840.) As we have found no error, defendant's cumulative prejudice argument must fail.

## G. SENTENCING ISSUES

### 1. The Stayed Prior Prison Term Enhancement

The parties agree that defendant's stayed one-year prior prison term enhancement (§ 667.5, subd. (b)) must be stricken in light of legislation passed after defendant was sentenced. (Stats. 2019, ch. 590, § 1; see *People v. Lopez* (2019) 42 Cal.App.5th 337, 340-341 [amendment narrows enhancement to apply only to prior sexually violent offense convictions].) We also agree and will strike the previously stayed prior prison term enhancement.

### 2. Amendment to Section 1170, Subdivision (b) (Senate Bill No. 567)

Defendant notes a recent amendment to section 1170, subdivision (b), and urges it requires resentencing on count 8, the first degree burglary of the Callaway home the trial court selected as the principal term. The parties agree that the statutory amendment applies to defendant under the reasoning of *In re Estrada* (1965) 63 Cal.2d 740, but disagree about the proper remedy. (Accord *People v. Flores* (2022) 75 Cal.App.5th 495.)

When defendant was sentenced, trial courts had broad discretion under section 1170, subdivision (b) to select the "appropriate term" for offenses that can be punished by three possible terms. (Former § 1170, subd. (b); Stats. 2018, ch. 1001, § 1.) Under the recent amendment, trial courts are now generally required to select the middle term. (§ 1170, subd. (b)(1).) A trial court may impose an upper term "only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances

21

have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (§ 1170, subd. (b)(2).) A trial court may consider "defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury." (§ 1170, subd. (b)(3).)

The trial court identified several factors in aggravation, including that: "the crimes involved great violence and threat of great bodily harm and disclosed a high degree of cruelty, viciousness, or callousness"; there were "elderly victims"; "the defendant was . . . encouraging, was part of the conspiracy" and "was not just a follower in any of this"; "the manner in which the crimes were carried out indicated planning, sophistication, or professionalism" as shown by the perpetrators who "[wore] masks, spoke in code, communicated through text messages, and utilized information from a co-defendant about homes, when people would be gone"; defendant's "prior convictions do show an increasing seriousness and are numerous" and went "from vehicle thefts to carjacking and these home invasions"; "defendant was on parole when the crime was committed"; and "defendant's performance on both probation—both in juvenile and on parole and adult were not satisfactory." The trial court also noted defendant used a gun during commission of the robbery, but stated "because that's an element of the crime, the Court will not consider that as an aggravator."

We agree with defendant that not all of the factors cited by the trial court were stipulated to by him or found true beyond a reasonable doubt by a factfinder. But we find any error harmless beyond a reasonable doubt. (*People v. Wandrey* (2022) 80 Cal.App.5th 962, 981 ["Error in relying on facts not found by the jury to impose an aggravated term is subject to review under the harmless error standard of *Chapman v. California* (1967) 386 U.S. 18."].) Two factors in aggravation were supported by defendant's convictions for count 3 (conspiracy to commit robbery and burglary). The overt acts alleged in the operative information as to count 3 describe defendant's

22

participation in three burglaries, two resulting in convictions in this case. Defendant and his co-conspirators are alleged to have planned burglaries over multiple months, including by communicating via text message and phone calls. Two of the overt acts came from the Callaway robbery: that defendant and Falk traveled to the Callaways' address in Los Gatos, and that they entered the residence. That conviction therefore supports two of the aggravating factors: that the crimes indicated planning, sophistication, or professionalism; and that defendant induced others to participate in the crimes. (Cal Rules of Court, rule 4.421(a)(8), (a)(4).) A single aggravating factor can support an upper term (*People v. Osband* (1996) 13 Cal.4th 622, 728), and both of those factors were permissible considerations under amended section 1170. We find any error in the trial court's reliance on other factors harmless beyond a reasonable doubt.

We are also confident that other factors would have been found true beyond a reasonable doubt had they been presented to the jury, because the associated facts are not in serious dispute. Jerry Callaway testified that he was 71 at the time of trial just over two years after the burglary, supporting a finding that he was a particularly vulnerable victim due to his age. (Cal. Rules of Court, rule 4.421(a)(4).) At the bifurcated court trial on defendant's prior convictions, a "certified state rap sheet" documenting defendant's criminal history was admitted into evidence. Even without a certified record of conviction, the CLETS database printout revealed a criminal history dating to 2006, including felony convictions for vehicle theft (Veh. Code, § 10851) and carjacking. Also admitted at the court trial on the prior convictions were a plea form and jail commitment order from the vehicle theft conviction, and an abstract of judgment from the carjacking conviction. Those records support a finding that defendant's "prior convictions as an adult or sustained petitions in juvenile delinquency proceedings are numerous or of increasing seriousness." (Cal. Rules of Court, rule 4.421(b)(2).) We acknowledge the carjacking conviction, standing alone, could not be used as an aggravating factor because it was also the basis for the prior serious felony conviction enhancement. (§ 1170,

23

subd. (b)(5) ["The court may not impose an upper term by using the fact of any enhancement upon which sentence is imposed under any provision of law."].) But that does not limit use of the conviction in considering defendant's criminal history as a whole.

Because we find any error arising from changes to section 1170 harmless beyond a reasonable doubt, defendant is not entitled to resentencing. As resentencing will not occur, the trial court will have no occasion to consider the circumstances added to section 1385 by Senate Bill No. 81, which expressly applies in sentencing beginning January 1, 2022. (§ 1385, subd. (c)(1), (7).)

### 3. Abstract of Judgment

The People argue that a new abstract of judgment must be prepared to accurately reflect the sentence imposed by the trial court, and defendant "accepts respondent's argument" on that point. As we will explain, we conclude the total term imposed by the trial court is 49 years. The trial court orally imposed terms that totaled 49 years eight months in prison, though when summarizing the sentence at the end of the hearing the trial court stated the total sentence was 51 years. There are two abstracts of judgment in the record, one imposing a total term of 51 years and another imposing 49 years.

The discrepancy between the oral pronouncement (49 years eight months) and the May 2019 abstract of judgment (49 years) appears to derive from the sentence for count 1, the Mukheed second degree robbery. For that count, the trial court stated it would impose "one-third the midterm on both the charge and the allegation" (doubled because of defendant's prior strike conviction). The court calculated its intended sentence as "six years[,] because it's one-third of eight and one-third of ten for a total of six." But the doubled middle term for *second* degree robbery is six years, not eight. (§ 213, subd. (a)(2).) (We note the misstatement may have arisen because defendant had just been sentenced on two first degree robbery counts where the doubled middle term was eight years.) Effectuating the trial court's intent to impose "one-third the mid-term

24

on both the charge and the allegation," the correct term for count 1 is five years four months (two years for second degree robbery (§§ 213, subd. (a)(2), 1170.1, subd. (a)) plus three years four months consecutive for the firearm enhancement (§§ 12022.53, subd. (b), 1170.1, subd. (a))).

To summarize, defendant's total prison sentence is 49 years, calculated as follows (all base terms were doubled because of defendant's prior strike conviction (§ 667, subds. (b)-(i))): a principal upper term of 12 years for first degree robbery (count 8; § 213, subd. (a)(1)(B)), with 10 years consecutive for the firearm enhancement (§ 12022.53, subd. (b)) plus two years consecutive for the on-bail enhancement (§ 12022.1, subd. (b)); two years eight months consecutive for first degree robbery (count 9; §§ 213, subd. (a)(1)(B), 1170.1, subd. (a)) plus three years four months consecutive for the firearm enhancement (§§ 12022.53, subd. (b), 1170.1, subd. (a)); two years consecutive for second degree robbery (count 1; §§ 213, subd. (a)(2), 1170.1, subd. (a)) plus three years four months consecutive for the firearm enhancement (§§ 12022.53, subd. (b), 1170.1, subd. (a)); two years eight months consecutive for conspiracy to commit robbery and burglary (count 3; §§ 182, subd. (a)(1), 213, subd. (a)(1)(B), 1170.1, subd. (a)); two years eight months consecutive for first degree burglary (count 5; §§ 461, subd. (a), 1170.1, subd. (a)); one year four months consecutive for possessing a firearm as a felon (count 10; §§ 29800, subd. (a)(1), 1170.1, subd. (a)); two years consecutive for unauthorized vehicle use with a prior conviction (count 12; §§ 666.5, subd. (a), 1170.1, subd. (a)); and five years consecutive for the prior serious felony conviction (§ 667, subd. (a)). The abstract of judgment dated May 20, 2019, correctly reflects the foregoing calculation.

### III.   DISPOSITION

The judgment is modified to strike the previously stayed prior prison term enhancement (Pen. Code, § 667.5, subd. (b)). As so modified, the judgment is affirmed. The clerk of the superior court is directed to prepare a new abstract of judgment

25

reflecting both that modification and the 49-year total sentence correctly shown on the May 20, 2019 abstract of judgment.

_____
Grover, J.

WE CONCUR:

_____
Greenwood, P.J.

_____
Lie, J.

**H046931**
*People v. Steward*